The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 8, 2019

## 2019COA125

**No. 18CA1145, *People in Interest of A.B-A.* — Juvenile Court —
Dependency and Neglect — Uniform Child Custody Jurisdiction
and Enforcement Act — Temporary Emergency Jurisdiction**

In this dependency and neglect case, a division of the court of
appeals concludes that the human rights "escape clause" of the
Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA)
did not apply to excuse enforcement of a prior child custody order
entered by an Iranian court. As a result, the division concludes
that the juvenile court exceeded its temporary emergency
jurisdiction under the UCCJEA when it terminated parental rights.

Court of Appeals No. 18CA1145
Adams County District Court No. 16JV301
Honorable Priscilla J. Loew, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of A.B-A., a Child,

and Concerning M.B. and S.T-K.,

Respondents-Appellants.

JUDGMENT VACATED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE PAWAR
Dailey and Casebolt*, JJ., concur

Announced August 8, 2019

Heidi M. Miller, County Attorney, Howard Reinstein, Deputy County Attorney, Westminster, Colorado, for Petitioner-Appellee

Jeff Ruff, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Denver, Colorado, for Respondent-Appellant M.B.

Pamela K. Streng, Office of Respondent Parents' Counsel, Georgetown, Colorado, for Respondent-Appellant S.T-K.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1 Mother, S.T-K., and father, M.B., appeal the juvenile court's judgment terminating their parent-child relationships with their son, A.B-A. We consider whether, under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA), sections 14-13-101 to -403, C.R.S. 2018, the juvenile court lacked subject matter jurisdiction to terminate parental rights based on an existing child custody order in Iran. We also consider the Adams County Department of Human Services' (Department) contention that the juvenile court could disregard the prior child custody order either because the prior order does not conform to UCCJEA jurisdictional standards or because Iranian child custody law violates fundamental principles of human rights.

¶ 2 We conclude that the juvenile court lacked subject matter jurisdiction to terminate parental rights and could not disregard the Iranian order. We also conclude that the juvenile court erred in allowing the Department to serve father by publication. We therefore vacate the judgment and remand the case for further proceedings.

1

## I. Background

¶ 3  Mother, father, and the child are citizens of Iran. The parents divorced in Iran in 2009, when the child was six years old. Custody of the child remained with mother pursuant to a court order.

¶ 4  Mother moved to California in 2011. The child remained in Iran, where his maternal grandmother and father cared for him at different times between 2011 and 2015. The child joined mother in California in 2015.

¶ 5  Mother and the child moved to Colorado in August 2016. The following month, mother suffered a mental health crisis and entered a mental health facility on an involuntary hold. Consequently, the Department took the child into protective custody. The Department filed a petition in dependency or neglect in October 2016. The juvenile court entered a deferred adjudication as to mother and later adjudicated the child dependent and neglected as to mother.

¶ 6  Father was in Iran at all times during the proceeding. In July 2017, the Department moved to serve him by publication because it had been unable to contact him. The juvenile court granted the motion, and the Department published a summons in an Adams

County-area newspaper.  Shortly thereafter, the juvenile court entered a default adjudication as to father.

¶ 7     The Department moved to terminate parental rights in December 2017.  In April 2018, the day before the scheduled termination hearing, father contacted the family's caseworker.  He said he had just learned of the case and wanted the child returned to him.  Father continued to telephone the caseworker over the next month.  Even so, in May 2018, the juvenile court terminated both parents' parental rights.

## II. The Juvenile Court's Subject Matter Jurisdiction Under the UCCJEA

¶ 8     Mother contends that the juvenile court lacked subject matter jurisdiction to terminate parental rights under the UCCJEA, sections 14-13-101 to -403, C.R.S. 2018, because an Iranian child custody order was already in effect.  We review the juvenile court's subject matter jurisdiction under the UCCJEA de novo and agree with mother.  *People in Interest of C.L.T.*, 2017 COA 119, ¶ 14.

### A. Foreign Child Custody Orders in Dependency and Neglect Proceedings

¶ 9     Dependency and neglect proceedings must comply with the UCCJEA.  *People in Interest of M.S.*, 2017 COA 60, ¶¶ 11-12.  The

UCCJEA establishes a comprehensive framework that a Colorado court must use to determine whether it may exercise jurisdiction in a child custody matter or whether it must defer to a court of another state. *C.L.T.,* ¶ 16. Subject to the limitations discussed below, Colorado courts must treat a foreign country as though it were a state of the United States for purposes of jurisdiction under the UCCJEA. § 14-13-104, C.R.S. 2018; *In re Parental Responsibilities Concerning T.L.B.,* 2012 COA 8, ¶ 19. As this case concerns a foreign country's child custody order, we will discuss provisions of the UCCJEA that refer to another "state" in terms of their application to a "foreign country."

¶ 10     The UCCJEA aims to avoid jurisdictional competition over child custody matters in an increasingly mobile society. *See Brandt v. Brandt,* 2012 CO 3, ¶ 19; *C.L.T.,* ¶ 15; *M.S.,* ¶ 15. To that end, the UCCJEA provides that the foreign court that issued a child custody order retains exclusive, continuing jurisdiction over the determination. § 14-13-202, C.R.S. 2018. The foreign court's jurisdiction continues until (1) the foreign court determines that it no longer has exclusive, continuing jurisdiction; (2) the foreign court declines jurisdiction on the ground that Colorado provides a

more convenient forum; or (3) either the foreign court or a Colorado court determines that the child, the parents, and anyone acting as a parent do not presently reside in the foreign country. § 14-13-203, C.R.S. 2018; *C.L.T.*, ¶ 31. As relevant here, the foreign court may not be deprived of jurisdiction if a parent presently resides in the foreign country. *Brandt*, ¶ 27.

¶ 11 A Colorado court may not modify a foreign child custody order unless two conditions are met: (1) the Colorado court has jurisdiction to make an initial custody determination under section 14-13-201, C.R.S. 2018; and (2) the foreign court has lost or ceded jurisdiction under section 14-13-203.

¶ 12 Notwithstanding a prior, enforceable foreign child custody order, however, a Colorado court may exercise temporary emergency jurisdiction to protect a child who is present in Colorado from mistreatment, abuse, or abandonment. § 14-13-204, C.R.S. 2018; *T.L.B.*, ¶ 21; *see also People in Interest of M.C.*, 94 P.3d 1220, 1225 (Colo. App. 2004).

¶ 13 But this temporary emergency jurisdiction under the UCCJEA is limited in scope and in time. Importantly, a Colorado court exercising temporary emergency jurisdiction may not enter a

permanent custody disposition. *M.C.*, 94 P.3d at 1225 (while exercising temporary emergency jurisdiction, a juvenile court may not adjudicate a child dependent or neglected or terminate parental rights). When exercising temporary emergency jurisdiction to enter a temporary emergency order, the Colorado court must specify in its order a time period that the court considers adequate to allow the person seeking a child custody determination to obtain an order from the foreign court. § 14-13-204(3). And the Colorado order remains in effect only until the foreign court enters an order or the period expires, whichever occurs earlier. *Id.*; *T.L.B.*, ¶ 21 (a temporary emergency order under the UCCJEA lapses as soon as the court that otherwise has jurisdiction enters an order).

¶ 14   Because the juvenile court's emergency jurisdiction is limited in scope and time, it is imperative that the juvenile court promptly ascertain whether a foreign custody order exists and, if one does, whether the foreign order limits the juvenile court's jurisdiction. *See* 19 Frank L. McGuane, Jr. & Kathleen A. Hogan, *Colorado Practice Series: Family Law and Practice* § 27:9, Westlaw (2d ed. database updated May 2019) (the emergency nature of proceedings does not suspend the juvenile court's obligation to communicate

6

with the court of another jurisdiction regarding a prior custody action). To facilitate the court's assessment, each party to a dependency and neglect proceeding must provide information regarding where and with whom the child has resided during the last five years; any other proceeding involving custody, visitation, or parenting time with the child; any proceeding that might affect the Colorado dependency and neglect proceeding; and the names and addresses of nonparties who might have physical custody of the child or claim rights of parental responsibilities, custody, visitation, or parenting time. § 14-13-209, C.R.S. 2018. This duty of disclosure applies to parents, social services agencies, guardians ad litem, and any other persons who may have acquired party status as intervenors or otherwise. *C.L.T.*, ¶ 22 n.1. The department, as the petitioning party in dependency and neglect proceedings, bears the burden of establishing the juvenile court's subject matter jurisdiction under the UCCJEA. *See Brandt*, ¶ 33.

¶ 15    When the juvenile court discovers a foreign custody order, the Colorado court must immediately confer with the foreign court "to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary

7

order." § 14-13-204(4); *see also* § 14-13-110, C.R.S. 2018; *People in Interest of D.P.,* 181 P.3d 403, 407 (Colo. App. 2008) (Colorado judge must personally confer with issuing court and may not delegate that responsibility to a law clerk).

¶ 16    With this framework in mind, we now turn to the facts of this case.

### B. The Juvenile Court Lacked Subject Matter Jurisdiction to Terminate Parental Rights

¶ 17    In December 2017, the Department filed with the juvenile court an English translation of the parents' Iranian dissolution decree.  The decree includes an order granting custody of the child to mother.

¶ 18    At the termination hearing, mother's counsel asserted that, under the UCCJEA, the juvenile court lacked jurisdiction to terminate parental rights.  The juvenile court stated that it was unsure whether a specific Iranian child custody order existed. Without resolving this issue, the court found that it had jurisdiction and terminated both mother's and father's parental rights.  This was error.  Because there was an Iranian child custody order in place, the only jurisdiction that the juvenile court could exercise

8

was temporary emergency jurisdiction under section 14-13-204(4). And temporary emergency jurisdiction does not allow a court to enter a permanent custody disposition, as the juvenile court did here. We therefore conclude that the juvenile court lacked subject matter jurisdiction to terminate mother's and father's parental rights.

¶ 19 The Department argues that the Iranian child custody order did not limit the juvenile court to exercising only temporary emergency jurisdiction because (1) the Iranian child custody order does not conform to the UCCJEA's jurisdictional standards and (2) the child custody law of Iran violates fundamental principles of human rights. We reject both contentions.

### 1. The Order Conforms to the UCCJEA's Jurisdictional Standards

¶ 20 Colorado courts must recognize and enforce a foreign child custody order if it was made under factual circumstances that substantially comply with the UCCJEA's jurisdictional standards. § 14-13-104(2). As relevant here, these requirements are met if the issuing court was in the child's home state, the parents had notice of the proceeding, and the parents had an opportunity to be heard.

9

*See* § 14-13-201(1)(a) (establishing criteria for home state jurisdiction to make an initial child custody determination); § 14-13-205, C.R.S. 2018 (parents must have notice and an opportunity to be heard).

¶ 21    Where, as here, the material facts underlying a jurisdictional issue are not in dispute, we review the matter de novo as a question of law.  *Springer v. City & Cty. of Denver*, 13 P.3d 794, 798 (Colo. 2000).

¶ 22    The child custody order contains sufficient facts to demonstrate substantial conformity with the UCCJEA's fundamental jurisdictional requirements.  Because the child custody order is a provision of the order dissolving the parents' marriage, we consider the dissolution order as a whole.

¶ 23    The dissolution order includes facts establishing that Iran was the child's home state.  Specifically, the order states that both parents resided in Tehran, Iran, and that the issuing court is in Tehran.  As well, the order indicates that both parents participated in the proceeding by stipulating to the division of property and child custody.  It states that father accepted certain property from

mother, agreed to divorce mother, and waived his right to custody of the child.

¶ 24   The Department asserts that the order is inadequate because it does not describe the factors the court considered in making its custody determination.  But this is irrelevant to the jurisdictional question.  *See* § 14-13-201 cmt. 2 (explaining that the UCCJEA eliminated "best interest" language used by its predecessor, the Uniform Child Custody Jurisdiction Act (UCCJA), because it "tended to create confusion between the jurisdictional issue and the substantive custody determination"); *Brandt*, ¶ 23 (by removing best interests analysis, the UCCJEA avoids injecting the merits of a custody dispute into the determination of jurisdiction).

¶ 25   For these reasons, we conclude that the Iranian custody order was made under factual circumstances in substantial conformity with the jurisdictional standards of the UCCJEA.

2. The Human Rights Exception Does Not Apply

¶ 26   Alternatively, the Department contends that the Iranian custody order is not enforceable in Colorado and therefore did not limit the juvenile court's jurisdiction because the child custody law

11

of Iran violates fundamental principles of human rights. *See*
§ 14-13-104(3). We disagree.

¶ 27 The UCCJEA does not require enforcement of a foreign child custody order if the child custody law of the foreign country violates fundamental principles of human rights. § 14-13-104(3).

¶ 28 The UCCJEA does not define the phrase "fundamental principles of human rights," and the comment accompanying section 14-13-104 expressly "takes no position on what laws relating to child custody would violate fundamental freedoms." § 14-13-104 cmt. "While the provision is a traditional one in international agreements, it is invoked only in the most egregious cases." *Id.* In applying section 14-13-104, "the court's scrutiny should be on the child custody law of the foreign country and not on other aspects of the other legal system." *Id.*

¶ 29 The comment notes that Section 20 of the Hague Convention on the Civil Aspects of International Child Abduction contains a similar provision. *Id.* Courts interpreting the UCCJEA's "escape clause" — as the human rights exception is commonly known — have looked to that provision for guidance. *See, e.g., Coulibaly v. Stevance,* 85 N.E.3d 911, 917 (Ind. Ct. App. 2017); *Toland v. Futagi,*

40 A.3d 1051, 1058 (Md. 2012); *In re Yaman,* 105 A.3d 600, 611 (N.H. 2014).  Construing Section 20, the United States Department of State has explained that a country may invoke the human rights exception "on the rare occasion that [to do otherwise] would utterly shock the conscience of the court or offend all notions of due process."  Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986). The exception "was intended to be restrictively interpreted and applied, and . . . not to be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on the political system of [another] country."  *Id.*

¶ 30    The interpretation of the escape clause is a question of first impression in Colorado.

¶ 31    The Department argues that Iran's child custody law violates fundamental principles of human rights because it does not require an evaluation of the child's best interests or ensure that mothers are afforded an equal opportunity to parent their children.  In particular, the Department alleges in its answer brief that Iranian child custody law includes the following features:

- Fathers are considered the head of the family and have legal custody of children even when mothers have physical custody.

- Fathers exercise direct control over their children's movement, including change of residence, choice of employment, travel abroad, and obtaining a driver's license or passport.

- Custody of a child automatically transfers to the father when the child turns seven years old unless the father is found legally unfit to care for the child.

- A Muslim mother who converts to a different religion will lose custody of her child.

¶ 32    The Department did not invoke the human rights exception in the juvenile court.  Consequently, the juvenile court did not address it.  And on appeal, the Department does not identify any record evidence or include any legal citation to support its characterization of Iranian child custody law.  We are unwilling to say that Iranian child custody law violates fundamental principles of human rights based on nothing more than the Department's unsupported claims.  Because the record does not establish that the escape clause

14

applies, we conclude that the juvenile court was required to recognize the Iranian child custody order.

¶ 33 In so concluding, we also note that nothing about the Iranian child custody order *in this case* suggests a violation of fundamental principles of human rights. *See Coulibaly*, 85 N.E.3d at 918-19 (the UCCJEA does not limit courts to considering foreign child custody law "only on its face, without regard to whether that law was applied in a manner violative of fundamental human rights").

¶ 34 Most of the Department's escape clause arguments center around an alleged gender preference given to fathers in Iranian child custody determinations. (Again, these are arguments made without citation to Iranian law.) But the Iranian child custody order in this case does not enforce a gender presumption. Instead, the Iranian court's dissolution order granted full custody to mother:

> The permanent custody of the common son named [A.B-A.], 6 years old, is by [mother] and [father] waived from himself the right of custody. [Child support] of the son is 1000000 Rls. per month and should be paid by [father] to [mother].

¶ 35 As to the assertion that Iranian child custody law deprives non-Muslim mothers of custody rights, the Department does not

suggest that mother was in danger of losing custody based on her religious practice. And under the circumstances of this case, in which the juvenile court has already purported to terminate mother's parental rights on different grounds, we perceive no potential prejudice to mother.

¶ 36 To support application of the escape clause in this case, the Department relies heavily on the decision in *Amin v. Bakhaty*, 798 So. 2d 75 (La. 2001), in which the Louisiana Supreme Court considered whether to cede jurisdiction to an Egyptian court under the UCCJEA's predecessor, the UCCJA. The Department points to similarities between the child custody law of Egypt and Iran — again, without citation to legal authority. The analogy to *Amin* fails for three reasons.

¶ 37 First, the court in *Amin* reviewed whether a Louisiana trial court had discretion to exercise jurisdiction to enter an initial child custody order — not whether the trial court had jurisdiction to modify a prior custody order. *Id.* at 77.

¶ 38 Second, the *Amin* court determined that it could exercise jurisdiction because doing so served the best interests of the subject child. *Id.* at 79-80 (interpreting residual jurisdiction under

La. Stat. Ann. § 13:1702(A)(4)(ii) (2001)). But the UCCJEA no longer allows courts to exercise jurisdiction on this basis. An official comment to section 14-13-201 states that the "best interest" language of the UCCJA was eliminated because it "tended to create confusion between the jurisdictional issue and the substantive custody determination." § 14-13-201 cmt. 2.

¶ 39 Third, the *Amin* court did not consider, as we must, whether the foreign country's child custody law violated fundamental principles of human rights. *Amin* is therefore unhelpful in determining whether the escape clause applies here.

¶ 40 For these reasons, we conclude that the human rights exception did not permit the juvenile court to disregard the Iranian child custody order in this case. Because the juvenile court had to recognize the Iranian child custody order, it could exercise only temporary emergency jurisdiction under the UCCJEA. The juvenile court had no authority to enter permanent custody orders. By entering permanent custody orders that terminated mother's and father's parental rights, the juvenile court exceeded its jurisdiction. We must therefore vacate that judgment.

C. The Absence of Diplomatic Relations with Iran is Irrelevant

¶ 41 The Department argues that the juvenile court's lack of jurisdiction to enter permanent custody orders was harmless error because the United States has no diplomatic relations with Iran.

¶ 42 First, and most importantly, the Department cites no authority, and we are aware of none, for the proposition that a court's actions in excess of its jurisdiction may be deemed harmless. A court without jurisdiction "is deprived of any authority to act." *People in Interest of P.K.*, 2015 COA 121, ¶ 9. The Department does not explain how we could affirm a judgment that a court lacked authority to enter.

¶ 43 Second, to the extent that the Department intended to argue that the absence of diplomatic relations with Iran meant that the juvenile court's exercise of jurisdiction in this case was proper, we disagree. According to the Department, because the United States has no diplomatic relations with Iran, the juvenile court could not have conferred with an Iranian court. This argument requires us to resolve two questions: Does the absence of diplomatic relations (1) provide an exemption from the UCCJEA as a matter of law; or,

alternatively, (2) excuse the court's failure to comply with the UCCJEA in this case? We answer both questions "no."

¶ 44 The first question requires us to interpret the UCCJEA. Statutory construction involves a question of law that we review de novo. *People in Interest of C.L.S.*, 313 P.3d 662, 665-66 (Colo. App. 2011). Our goal is to effectuate the intent of the legislature. *Id.* at 666. We begin by applying the plain language of the statute, giving words and phrases their ordinary meanings. *Id.* If the language is unambiguous, we do not resort to other methods of statutory construction. *Id.* "Where the legislature could have chosen to restrict the application of a statute, but chose not to, we do not read additional restrictions into the statute." *Springer*, 13 P.3d at 804.

¶ 45 Section 14-13-104 expressly provides two exceptions to the rule that Colorado courts must treat a foreign country as if it were a state of the United States for purposes of determining jurisdiction under the UCCJEA. The exceptions do not include an exemption for a foreign country that has no diplomatic relations with the United States. We will not read such an exception into the statute. *See Springer*, 13 P.3d at 804. Consequently, the absence of diplomatic relations between Iran and the United States does

19

nothing to alter the juvenile court's duty to confer with the Iranian court that issued the custody order.

¶ 46 Nor does the lack of diplomatic relations make it impossible for the juvenile court to attempt to fulfill this duty in this case. The record does not support the Department's assertion that the juvenile court had no means of contacting the Iranian court. Instead, the record shows only that the juvenile court did not recognize its duty to confer and, as a result, made no effort to do so. The Department's speculation that such efforts would have failed is just that: speculation. Such speculation provides no basis to conclude that the court's error was harmless.

¶ 47 In the end, because the juvenile court lacked subject matter jurisdiction to terminate either parent's parental rights, we vacate the judgment of termination.

### III. Father Is Entitled to Notice and An Opportunity to Be Heard on Remand

#### A. The Juvenile Court Erred When It Allowed Service by Publication

¶ 48 Father contends that the juvenile court erred when it granted the Department's motion to serve him by publication in Adams County knowing that he was in Iran. We agree.

20

¶ 49     We review the constitutional sufficiency of service by publication de novo. *Synan v. Haya*, 15 P.3d 1117, 1119 (Colo. App. 2000).

¶ 50     Due process requires, at a minimum, that a parent receive adequate notice of a dependency and neglect proceeding and an opportunity to be heard. *People in Interest of M.M.*, 726 P.2d 1108, 1115 (Colo. 1986); *Synan,* 15 P.3d at 1119. Notice must be reasonably calculated to apprise parents of the pendency of an action and afford them an opportunity to present objections. *In re C.L.S.,* 252 P.3d 556, 559 (Colo. App. 2011). And, when termination is sought, "due process requires that a parent be provided with adequate notice of a termination hearing and an opportunity to protect [his or] her interests at the hearing itself." *M.M.,* 726 P.2d at 1115.

¶ 51     Section 19-3-503(8)(b), C.R.S. 2018, authorizes service by publication in dependency and neglect actions when a parent has no residence in Colorado and his or her place of residence is unknown. C.R.C.P. 4(g) provides that a motion for service by publication shall include the following information:

- the facts authorizing service by publication;

- the efforts, if any, that have been made to obtain personal service; and

- the address, or last known address, of the person to be served or a statement that the address and last known address are unknown.

The motion must establish that the party seeking service by publication exercised due diligence to obtain personal service or that efforts to do so would have been to no avail. C.R.C.P. 4(g).

¶ 52    Even when the person to be served cannot be located, service by publication may still not be constitutionally sufficient if other means of service are more likely to afford actual notice. *See Synan*, 15 P.3d at 1120. For example, if the person's identity and something of his or her whereabouts are known, service by publication alone is unlikely to pass constitutional muster. *Id.* Instead, when "some evidence indicates the whereabouts of [an] absent party, any form of substituted service authorized by the trial court must have a reasonable chance of giving that party actual notice of the proceeding." *Id.* (publication in Denver-area newspaper did not satisfy due process when evidence indicated the defendant was in Japan).

¶ 53     The Department submitted an affidavit in support of the motion for publication. The affidavit averred that it "state[d] in detail all of the efforts made by [the Department] to procure personal service" on father. But it did not describe any efforts to locate father or make contact with him. Instead, the affidavit stated that father was in Iran, the caseworker was unable to contact him or his family, and the caseworker knew of no source of information to assist the Department in providing personal service. The affidavit also stated, in conclusory fashion, that the Department had exercised due diligence in attempting to locate father.

¶ 54     Further, while mother could presumably have provided the address at which she and father had previously resided together, the affidavit stated that father's last known address was unknown. And, although plainly incorrect, the affidavit stated that the actual identity of the child's biological father was unknown.

¶ 55     The juvenile court granted the Department's motion to serve father by publication in an Adams County-area newspaper. But the evidence before the court did not establish what, if any, efforts the Department had made to locate father. *See* C.R.C.P. 4(g). And the evidence indicated that father was in Iran, but it did not establish

whether the Department had attempted to provide personal service by any means that would likely result in father receiving actual notice. *See Synan,* 15 P.3d at 1120.

¶ 56 Thus, we conclude that the juvenile court erred when it allowed the Department to serve father by publication.

### B. The Department's Later Efforts and Contact with Father Did Not Cure the Juvenile Court's Error

¶ 57 The Department purported to serve father by publication in August 2017, and the juvenile court adjudicated the child dependent or neglected as to father later that month. In November 2017, the caseworker asked mother's relatives in Iran for father's contact information, but they did not have it. In late December 2017, the caseworker had the child send father a message via Facebook with her contact information and a request to contact her. The Department's diligent search team also contacted father through Facebook, but the record does not indicate whether the message was in English or Farsi, the only language that father speaks. And the record does not establish whether either message apprised father of the dependency and neglect proceeding or the reason for the caseworker's request.

24

¶ 58    In April 2018, two days before the termination hearing was set, father's nephew contacted the caseworker.  The nephew advised the caseworker that father had received her Facebook message and wished to speak with her.

¶ 59    Father and the caseworker spoke the next day via telephone with a Farsi interpreter.  According to the caseworker's report, father said that he was very concerned about the child and wanted to know what was happening with him.  The caseworker told father that the Department had moved to terminate parental rights, that the child had decided he did not want to return to Iran, and that the Department was not in favor of returning the child to Iran.  Father responded that he would not relinquish his parental rights and would do whatever it took to fulfill his parental duties.  He told the caseworker that he wanted the child to return home and explained that he had allowed the child to move with mother to the United States for a better life, but it was "not ok[ay] how this case [had] opened."  He asked how he could get involved in the case.

¶ 60    The caseworker told father she would contact him after the termination hearing the next day.  In her report, the caseworker recommended that the juvenile court terminate father's parental

rights. At the hearing, however, the Department and the guardian ad litem moved to continue the hearing to allow time to assess the child's wishes.

¶ 61 The juvenile court continued the termination hearing for one month. At the next hearing, the caseworker testified that father had telephoned her frequently during the past month. She reported that father said he was unable to travel to the United States because he was "not welcome" here. And, as father notes in his opening brief, an executive order banning most Iranian nationals from traveling to the United States was in effect when father learned of the proceedings. *See* Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017).

¶ 62 Despite the caseworker's extensive contact with father before the termination hearing, the record does not indicate that she asked him for his mailing address or that the Department otherwise attempted personal service. Nor does the record show that father ever received formal notice of the dependency and neglect proceeding, a copy of the petition in dependency and neglect, a copy of the motion for termination, or any advisement of his rights. *See*

26

§ 19-3-503 (summons shall set forth parent's constitutional and legal rights).

¶ 63    To the extent father had actual notice of the proceeding through his communication with the caseworker, such notice did not cure the court's error. *See People in Interest of J.C.S.*, 169 P.3d 240, 252 (Colo. App. 2007) (Taubman, J., dissenting) (actual notice is not a substitute for the formal requirements of service of process in dependency and neglect proceedings). Unlike in other civil cases, a summons in a dependency and neglect proceeding must advise respondent parents of their rights, including the right to counsel, and explain that the termination of the parent-child relationship is a possible remedy under the proceeding. § 19-3-503(1). The record does not indicate that the caseworker provided any of this information to father.

¶ 64    On remand, the juvenile court shall order the Department to serve father with the petition in dependency and neglect in accordance with section 19-3-503.

### C. Father's Remaining Contentions

¶ 65    Because we vacate the termination judgment, we need not address father's contentions that the juvenile court violated his

27

right to due process by (1) failing to appoint counsel to represent him and (2) terminating his parental rights on the ground of abandonment without requiring the Department to show what efforts it had made to locate him.  We note, however, that the juvenile court must ensure that father has a meaningful opportunity to participate in the proceedings, including representation by court-appointed counsel if appropriate.  *See* §§ 19-1-105, 19-3-202(1), C.R.S. 2018.

## IV. Conclusion

¶ 66    The judgment terminating mother's and father's parental rights is vacated, and the case is remanded for further proceedings.  On remand, the juvenile court shall provide notice of the dependency and neglect proceeding to father in accordance with section 19-3-503.

¶ 67    The juvenile court shall limit the duration and scope of its temporary emergency jurisdiction consistent with section 14-13-204.  The juvenile court shall immediately communicate with the Iranian court on the record in accordance with sections 14-13-204(4) and 14-13-110.

JUDGE DAILEY and JUDGE CASEBOLT concur.